# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARIO P. CHAPLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-625 (RMC) |
| | ) | |
| STEPHEN L. JOHNSON,[1] | ) | |
| Administrator, | ) | |
| U.S. Environmental Protection Agency, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Mario P. Chaple took an "early out" and retired from the Environmental Protection Agency ("EPA"). Before he departed, he had filed equal employment opportunity ("EEO") complaints on March 20, 2001, August 31, 2001, July 11, 2002, January 21, 2003, February 12, 2003, September 17, 2003, and October 8, 2003. Failing satisfactory adjustments, Mr. Chaple brought this suit against Defendant Stephen L. Johnson, EPA Administrator, in his official capacity, seeking damages for alleged national origin and age discrimination, as well as retaliation for EEO activity. Specifically, Mr. Chaple complains of constructive discharge, one failure to promote, one failure to award him a promotional detail, one involuntary transfer, one reduction of duties, a hostile work environment, and retaliation. The parties have engaged in full discovery, and the EPA has filed a motion for summary judgment, which Mr. Chaple opposes. The Court will grant the motion in part and deny it in part.

---

[1] Mr. Johnson has been substituted for Michael O. Leavitt, his predecessor as Administrator, Environmental Protection Agency, pursuant to Fed. R. Civ. P. 25(d)(1).

## I. BACKGROUND FACTS

Born in 1955 in Mayaguez, Puerto Rico, Mr. Chaple is of Puerto Rican and Cuban heritage.  Pl.'s Statement of Material Facts in Genuine Dispute ("Pl.'s Facts") at 1; Am. Compl. ¶ 4.  The EPA hired him on February 14, 1999, as a Contract Specialist (Team Leader) in the Superfund/RCRA Procurement Operations Division ("SRRPOD"), Office of Acquisition Management ("OAM"), Office of Administration and Resources Management.  Pl.'s Facts at 3.  His position was non-supervisory and was classified on the General Schedule ("GS") at Grade 14.  *Id.*

At the time, SRRPOD was organized into four Service Centers, each headed by a GS-15 supervisor.  *Id.*  Mr. Chaple worked first in the Enforcement and Laboratory Analysis Service Center ("ELASC") under Joseph Waddell, from February 1999 until May 2000.  *Id.* at 4.  He then transferred at his own request to the Superfund Contracts Service Center ("SCSC"), where Celia Vaughn was his supervisor.  *Id.*  Mr. Chaple remained in SCSC until January 12, 2003, when, as part of a reorganization of SRRPOD, the EPA transferred him involuntarily to the Procurement Management and Regional Coordination Service Center ("PMRCSC").  *Id.*  In this last position, Mr. Chaple again worked for Mr. Waddell.  Def.'s Statement of Material Facts as to Which There is No Genuine Dispute (Def.'s Facts") at 1.  Harvey ("Pat") Patterson was the director of SRRPOD from 1999 to July 2002, when Mr. Patterson was reassigned; in September 2002, Yvette Garner became its director.  Def.'s Facts ¶ 30.

To Mr. Chaple's observation, SRRPOD had an unfair habit of non-competitive promotions through accretion of duties or non-competitive details which gave a favored candidate

an unfair advantage.  Am. Compl. ¶ 7.  He first raised this point as early as June 1999,[2] *id*., but filed no EEO complaint until Robert Edgeton, based in Ohio, arrived on detail in January 2001 to be Acting Manager of the Regional/Remedial Service Center ("RRSC") (later renamed PMRCSC). Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 5.  Mr. Chaple sought EEO counseling on January 31, 2001, and filed a formal EEO complaint concerning Mr. Edgeton's detail on March 20, 2001.  *Id*.  In May 2001, Mr. Patterson advised SRRPOD employees that they could apply for a detail as Acting Manager of RRSC, but Mr. Chaple did not apply.  *Id*. at 5-6.  When, however, the permanent GS-15 position of RRSC Manager was posted on June 14, 2001, Mr. Chaple submitted an application.  *Id*. at 6.  Mr. Edgeton was selected for the position on August 14, 2001.  *Id*. at 7.

In January 2001, Mr. Patterson had appointed Mr. Chaple to represent OAM as Co-Chair of an intra-agency workgroup named the "Phase II Design Construction Workgroup."  Def.'s Facts ¶ 24.  In July 2001, however, Mr. Edgeton attended a conference with other EPA managers and heard complaints about OAM's participation on the workgroup.[3]  Pl.'s Opp'n at 6.  Thereafter, Mr. Patterson removed Mr. Chaple from his position as Co-Chair and replaced him with Ms. Vaughn, although Mr. Chaple continued to be involved with the workgroup and provided support to Ms. Vaughn.  *Id*.

---

[2] Specifically, in April 1999, Mr. Waddell was temporarily detailed from his GS-14 Team Leader position with the Headquarters Contract Service Center to the position of Acting Manager of ELASC.  Mr. Waddell remained on detail in the position until it was posted as a GS-15 "temporary [job] not to exceed one year" that could be "made permanent without further competition."  Def.'s Facts ¶ 14.  Mr. Chaple did not apply.  Mr. Waddell was awarded the temporary position and then was promoted into it on a permanent basis.

[3] Mr. Chaple acknowledges that he and the EPA dispute whether the complaints were about Mr. Chaple or Mr. Patterson.  Mr. Patterson stated that Mr. Chaple was "impeding" the progress of the workgroup by constantly complaining.  Pl.'s Opp'n at 6.  Ms. Vaughn indicated that Mr. Patterson was "sabotaging" the workgroup.  *Id*. at 7.

Mr. Patterson was reassigned as manager of OAM in July 2002 and was replaced by Ms. Garner in September 2002. Def.'s Facts ¶ 30. Ms. Garner decided to reorganize SRRPOD; this entailed renaming some of the Service Centers, realigning the associated duties, reassigning each of the Service Center supervisors to a different Center, and reassigning three of nine Team Leaders, including Mr. Chaple. *Id.* ¶¶ 31-32; Pl.'s Opp'n at 8-9. Ms. Garner's plan included transferring Mr. Edgeton to supervise SCSC, where Mr. Chaple worked at the time,[4] Pl.'s Facts at 10-11 & Def.'s Facts ¶ 35, and transferring Ms. Vaughn, then supervisor of SCSC, to supervise Headquarters Contract Service Center. Def.'s Facts ¶ 35; Pl.'s Opp'n at 9. Mr. Chaple sent an email to Ms. Garner complaining of the possibility of working for Mr. Edgeton, who was involved in Mr. Chaple's EEO matters. Pl.'s Opp'n at 8. He offered to stay where he was, under a different supervisor, or to transfer with Ms. Vaughn. *Id.* at 9. Instead, Ms. Garner transferred Mr. Chaple away from both Mr. Edgeton and Ms. Vaughn and assigned him to be a Team Leader in the newly named PMRCSC, under Mr. Waddell. *Id.* at 8.

To say the least, Mr. Chaple was unhappy with this turn of events. He met with Mr. Waddell on December 23, 2002, and told him that he was suffering from anxiety and depression and may need an extended medical leave. *Id.* at 10. They met again on January 8, 2003, and Mr. Chaple told Mr. Waddell that he would be discussing an extended leave with his doctor, to begin on January 13, 2003, when Mr. Chaple's transfer was to become effective. *Id.* Mr. Chaple asserts that Mr. Waddell suggested he "quit" his EEO complaints against Mr. Patterson. *Id.* at 11. On January 9, 2003, Mr. Waddell provided a memo to Mr. Chaple, informing him of the medical documentation

---

[4] The pleadings do not clearly indicate the new name for SCSC. *Compare* Def.'s Facts ¶ 4 (SCSC later became the Removal and Program Support Service Center) *with* Pl.'s Facts at 10 (SCSC was later named the Emergency Response Service Center); *see also* Pl.'s Opp'n at 8.

that would be needed to support a request for extended medical leave. *Id*. Mr. Chaple complains that this request was extensive, excessive, unreasonable, and part of the hostile environment and retaliation that he has suffered. Mr. Chaple never requested or took medical leave. *Id*. at 10.

Effective January 12, 2003, Mr. Chaple became a Team Leader in PMRCSC. Def.'s Facts ¶ 41. He alleges that his new position had significantly reduced responsibilities and scope and was damaging to his career prospects. Pl.'s Opp'n at 10.

Subsequently, Mr. Chaple applied for two GS-15 details in Headquarters Procurement Operations Division ("HPOD"), posted on August 12, 2003. *Id*. at 12. The selecting official, Timothy Farris, interviewed Mr. Chaple on September 8, 2003, and on September 9, Mr. Farris told Mr. Chaple that he did not get either job. *Id*. Mr. Farris reputedly said that he needed to "groom" people because lots of people would soon be eligible to retire. *Id*. Mr. Chaple asserts that he was older (49) and more qualified than either of the two selectees, who were 32 and 40. *Id*.

Discouraged with his lack of success, Mr. Chaple signed papers on September 23, 2003, to retire early from the EPA with a cash payment. *Id*. at 13. His effective date of separation was January 2, 2004. Def.'s Facts ¶ 50. He filed this lawsuit on April 4, 2004.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes. 28 U.S.C. § 1331. Here, Plaintiff brought suit under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e--2000h-6. As this case presents a question of federal law, this Court has original jurisdiction.

B.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

Mr. Chaple brings something of a scatter-shot complaint, alleging that he suffered national origin and age discrimination at EPA and was retaliated against for asserting his EEO rights.

Despite the parties' extensive briefs and exhibits, the Court is unable to sort out the conflicting facts

on many of these points.  A few of his claims can, however, be resolved as a matter of law because

there is no dispute about the facts.

A.  Constructive Discharge

The complaint alleges that Mr. Chaple suffered a constructive discharge when the

circumstances of his work life caused him to apply for early retirement in September 2003.  Mr.

Chaple concedes that he never brought this matter to an EEO counselor and never filed an EEO

complaint concerning his separation from employment because he had feared that an EEO charge

would have caused EPA to deny him the early-out opportunity.  *See* Pl.'s Opp'n at 14 & 17.  This

argument fails as a matter of law, and the EPA's motion for summary judgment on this claim will

be granted.

Mr. Chaple understands the general requirements of the federal EEO process:

> Plaintiff acknowledges the requirement to exhaust administrative
> remedies imposed by regulation and relevant case law.  Under the
> regulations promulgated by the [Equal Employment Opportunity
> Commission], an aggrieved federal employee must contact an EEO
> counselor within 45 days of the alleged discriminatory act [or] the
> effective date of an adverse employment action.  29 C.F.R. §
> 1614.105(a)(1).    The  45  day  period  is  triggered  when  a
> "complainant should reasonabl[y] suspect discrimination, but before
> all the facts that would support a charge of discrimination become
> apparent.["] 29 C.F.R. § 1614.105(b).

Pl.'s Opp'n at 16.  Mr. Chaple admits that "he did not seek EEO counseling within 45 days of

signing the buyout agreement" and thus "did not comply with the regulatory requirements."  *Id.* at

17.  He argues that he was treated poorly in retaliation[5] for his prior protected activity and courts do

---

[5] Mr. Chaple explains that:

not always require exhaustion of a retaliation claims where the alleged retaliation arose from an administrative complaint that was exhausted. *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981); *see Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988) (because retaliation for filing an EEO complaint is reasonably related to the EEO complaint, the original EEO complaint obviates the need for a second complaint). Mr. Chaple asserts that he was "gun shy" about filing an EEO complaint concerning his alleged constructive discharge. Pl.'s Opp'n at 19.[6]

Compliance with the administrative procedures is required. "[S]trict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002). These requirements apply both to claims of discrimination and claims of retaliation under Title VII. *Id.* at 114, 122. However, like a statute of limitations, these limits are subject to equitable tolling, estoppel, and waiver, but those equitable doctrines are to be applied sparingly. *Id.* at 113.

At the summary judgment stage, the Court fully credits Mr. Chaple's explanation and draws all reasonable inferences in his favor: he failed to file a charge concerning his alleged

---

The decision to request an early retirement was based upon the ongoing hostile work environment including: attempted removal from the OAM diversity workgroup; Waddell suggestion to "quit" my EEO complaint; Waddell sick leave requirements; Waddell criticism for discussion at diversity training where he was not in attendance; being assigned GS-13 duties as there was no backfill of GS-13 Wanda Moorman detail; decision to accrete Ms. Stearrett; and the non-selection for two HPOD details . . . .

Pl.'s Ex. 3 at 64.

[6] But note that Mr. Chaple filed EEO complaints on September 17 and October 9, 2003, both immediately before and immediately after he applied for early retirement on September 23.

constructive discharge within 45 days of applying for early retirement because he feared that management would not approve an "early out" retirement for him.  Even if this rationale provides an equitable basis to toll the filing period until Mr. Chaple was no longer in such potential danger, that is, until after his actual retirement on January 2, 2004, this is not a basis to toll the filing period after Mr. Chaple retired.  In other words, once Mr. Chaple retired from the EPA, any reason for suspending his filing obligation as a matter of equity ceased to exist, and he had 45 days to contact an EEO counselor.  He did not do so.  Therefore, he did not exhaust his administrative remedies on his claim of constructive discharge, and summary judgment must be granted to the EPA.

### B.  Discriminatory Adverse Employment Actions and Retaliation

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms, and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees.  42 U.S.C. § 2000e-16.  To establish a prima facie case of discrimination, a plaintiff must show 1) that he is a member of a protected class; 2) that he suffered an adverse personnel action; 3) under circumstances giving rise to an inference of discrimination.  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).

"[N]ot everything that makes an employee unhappy" is an adverse action under Title VII.  *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *accord Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  "Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  Some types of adverse actions are obvious, such as discharge or failure to promote.  For those that are less clear, a plaintiff must show an action with "materially adverse

consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities." *Brown*, 199 F.3d at 457. The employment decision must inflict "objectively tangible harm." *Russell*, 257 F.3d at 818. "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citation omitted).

Title VII also prohibits an employer from retaliating against an employee because he "has opposed any practice made an unlawful employment practice by this title, or because [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that: 1) he engaged in protected activity; 2) he suffered an adverse action; and 3) a causal connection exists between the protected activity and the adverse action.[7] *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006). An "adverse action" supporting a retaliation claim is not limited "to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2409 (2006). However, a plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id*. Further, to support a claim for retaliation, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. The Supreme Court has emphasized that the employer's action must be "materially" adverse because the statute protects employees from significant harms and does not protect an employee from "those

---

[7] The causation component may be shown by demonstrating that the employer had knowledge of the plaintiff's protected EEO activity and that the employer took the adverse action shortly thereafter. *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998).

petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. at 2415.   Further, an objective, "reasonable person" standard applies.   *Id*.   Cases must be evaluated based on their unique circumstances.   *Id*.   "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.   But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional development might well deter a reasonable employee from complaining about discrimination."   *Id*. at 2415-16.

Once a plaintiff establishes a prima facie case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's action.   *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   If the defendant meets this burden, then the plaintiff must have the opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons, but were a "pretext" for discrimination.   *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804.

### 1.  Failure to Promote to GS-15 RRSC Service Center Manager Position

Mr. Chaple applied for this position when it was posted in June 2001 and it was awarded to Mr. Edgeton, who had been Acting Manager since January 2001.   The EPA moves for summary judgment in its favor, but the facts are dramatically in dispute and a jury must sort them out.   The EPA's motion for summary judgment on this claim must be denied.

### 2.  Failure to Award Promotional Detail – Two GS-15 Acting Manager Positions

Mr. Chaple claims that Mr. Farris denied him a temporary promotion to one of the two GS-15 "acting" positions in 2003 due to retaliation and age discrimination.   According to Mr.

Chaple, Mr. Farris explained that he needed to "groom people" in the face of a number of upcoming retirements. *See* Pl.'s Opp'n at 27. Mr. Farris also was aware of Mr. Chaple's EEO complaint against Mr. Patterson. *Id.* n.11. Mr. Farris denies any retaliation or discrimination.

Both parties have marshaled excerpts from various depositions that support their arguments. Without making credibility determinations, a task for the factfinder at trial and not for summary judgment, the Court cannot rule. The EPA's motion for summary judgment on these claims must be denied.

### 3. Involuntary Reassignment from Team Leader SCSC to Team Leader PMRCSC

Mr. Chaple lost no salary, benefits, or rank in grade when he was involuntarily transferred from the SCSC under Ms. Vaughn to the PMRCSC under Mr. Waddell on January 13, 2003. The EPA argues that it was not, therefore, an adverse action under Title VII. Mr. Chaple contradicts this argument — he says his new position was in essence a demotion in form and substance. His asserts that his duties were reduced, the position was no longer highly visible and career enhancing, and its tasks were insufficient to support a GS-14 grade. *See Holcomb*, 433 F.3d at 902-03 (jury could find that the extraordinary reduction in responsibilities constituted an adverse action); *Forkkio*, 306 F.3d at 1131 (reassignment with significantly reduced duties generally indicates an adverse action). Because at this stage of the litigation the Court must draw all justifiable inferences in favor of the non-movant, Mr. Chaple, this factual dispute cannot be resolved on the written record.

### 4. Reduction of Duties – Removal as Co-Chair, Phase II Design Construction Work Group

Mr. Chaple asserts that his removal as Co-Chair of the intra-agency work group

constituted an adverse action because it had been a highly visible and career-enhancing assignment that was removed in a very public way.  The Court disagrees.  This change in duties was minimal, as Mr. Chaple continued to be involved with the work group and to support Ms. Vaughn's work on it.  Mr. Chaple has not provided any evidence that this action had materially adverse consequences affecting the terms, conditions, or privileges of his employment or future employment opportunities. *Brown*, 199 F.3d at 457; *cf. Holcomb*, 433 F.3d at 902-03 ("extraordinary" reduction in responsibilities may constitute adverse action).

It is not clear, however, whether the removal of his committee assignment might be found by a jury to "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415.  The Court cannot make this determination from the written record.  Therefore, the Court will grant summary judgment to the EPA on Mr. Chaple's complaint that removing him from the Co-Chair position was a discriminatory adverse employment action.  However, the Court will deny the EPA's request for summary judgment on Mr. Chaple's claim that removing him from the Co-Chair position constituted retaliation for prior EEO activity. A jury must determine the retaliation claim.

### 5.  Allegedly Retaliatory Request for Medical Documentation

Mr. Chaple alleges that he and his doctor had determined that he needed an extended sick leave; that in January 2003, Mr. Waddell demanded excessive and overly intrusive medical information as a prerequisite for any request for sick leave; that he feared that any information he provided would be disseminated with no regard to his privacy; and that, therefore, he never requested sick leave and struggled with anxiety and depression, all in retaliation for prior protected activity. He connects his EEO activity and his potential request for extended sick leave through Mr.

Waddell's alleged advice that he "quit" his EEO pursuit of Mr. Patterson in response to their first discussion of his health.

The EPA responds that the information provided to Mr. Chaple concerning medical information necessary to support an extended sick leave request was provided to Mr. Waddell by Human Resources ("HR") and was entirely appropriate for the extended or indefinite sick leave intended by Mr. Chaple.  It further argues that this alleged discriminatory conduct does not amount to an adverse personnel action since, in fact, nothing happened and Mr. Chaple's job circumstances were not affected.

The Court agrees that providing Mr. Chaple with a description of the medical information necessary to support an extended period of sick leave was not an adverse action that would have dissuaded a reasonable employee from filing an EEO complaint.  *See Burlington*, 126 S. Ct. at 1209.  Mr. Chaple admits that he asked Mr. Waddell what information would be required to support an "extended" or "indefinite" sick leave that would continue over a period of "at the very least a few months".  Def.'s Ex. 32 at 1.  He does not dispute that Mr. Waddell obtained the information from HR and simply provided it to Mr. Chaple.  Instead, he contends that HR gave the wrong information to Mr. Waddell.  Pl.'s Opp'n at 37-38.  He blames his supervisor for the fact that his anxiety and depression continued even though he failed to submit an application for extended leave.  Mr. Chaple states that he failed to apply for extended leave due to his fears that his medical information would be indiscriminately disseminated, contrary to his rights under the Privacy Act, 5 U.S.C. § 552a.  Speculation of a future bad act does not support the claim that when Mr. Waddell provided to Mr. Chaple the information he had received from HR, Mr. Waddell retaliated against him because of EEO activities.  Summary judgment will be granted to the EPA on the allegations

concerning the request for medical information.

### C.  Hostile Work Environment

Mr. Chaple also alleges that he was subjected to a hostile working environment in violation of Title VII.  To support his claim, he alleges, *inter alia*, that Mr. Patterson attempted to assign Ron Wiley to Mr. Chaple's team after Mr. Wiley had allegedly threatened Mr. Chaple with violence, that Mr. Patterson removed Mr. Chaple as Co-Chair of the EPA Phase II Design Construction Workgroup, that Mr. Patterson denied Mr. Chaple's request to represent SRRPOD at an Hispanic Small Business Conference, that Mr. Patterson accused Mr. Chaple of advising another employee to file an EEO complaint, that Mr. Patterson constantly harassed Mr. Chaple, that Mr. Chaple's customer service awards were not recognized, and that Mr. Chaple's request for "flex-time" was denied.[8]  Pl.'s Opp'n at 39-40.

The Supreme Court has determined that the language of Title VII "is not limited to economic or tangible discrimination.  The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted).  Therefore, Title VII is violated when a plaintiff demonstrates that his "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 21.

---

[8] Although it appears that Mr. Patterson attempted to assign Mr. Wiley to Mr. Chaple's service center in February 2001, it is unclear when Mr. Wiley allegedly threatened Mr. Chaple with violence. Pl.'s Facts at 3.  Other actions allegedly taken against Mr. Chaple appear to have occurred between 2001 and 2003. *Id.* at 1-18.

To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that he is a member of a protected class, (2) that he was subject to unwelcome harassment, (3) that the harassment occurred because of his race or disability, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "It must be clear that the hostile work environment was the result of discrimination based on a protected status." *Id*. (citing *Richardson v. N. Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999)).

In determining whether a hostile work environment claim is substantiated, a court must look at all the circumstances of the plaintiff's employment, specifically focusing on such factors as the frequency of the discriminatory conduct, its severity, whether it is threatening and humiliating or is merely offensive, and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. The conduct must be sufficiently extreme to constitute an alteration in the conditions of employment, so that Title VII does not evolve into a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Consequently, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 91); *see also Lester*, 290 F. Supp. 2d at 32 (presence of a Ku Klux Klan letter, although "plainly serious and extremely offensive," was merely a single offensive act and therefore was insufficient to establish a claim of hostile work environment). Further, a plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected, since "discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work

-16-

environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester*, 290 F. Supp. 2d at 33 (citing *AMTRAK v. Morgan*, 536 U.S. 101,115-16 (2002)); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (stating that "workplace conduct is not measured in isolation").

For example, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the D.C. Circuit held that statements by three employees over a six-month period telling a plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved, were isolated instances that did not rise to the level of severity necessary to find a hostile work environment. *Id.* at 416-17. Similarly, in *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004), this Court found that a plaintiff's allegations that her employer humiliated her at important meetings, screamed at her in one instance, told her to "shut up and sit down" in one instance, and was "constantly hostile and hypercritical" did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair. *See also Hussain v. Nicholson*, 435 F.3d 359, 365-68 (D.C. Cir. 2006) (although plaintiff alleged twelve instances of disparaging conduct by his employer, no reasonable jury could find a hostile work environment because several claims were exaggerated and the remaining alleged behavior was not extreme).

The Court finds that Mr. Chaple's allegations do not rise to the level of a hostile work environment. Mr. Chaple essentially restates facets of his other Title VII claims of discrimination and retaliation, which are unconnected incidents that cannot be found to establish a united course of "severe and pervasive discriminatory intimidation." Although Mr. Chaple's removal from the position of Co-Chair of the EPA Phase II Design Construction Workgroup may have been

embarrassing, and Mr. Patterson's and Mr. Waddell's alleged comments as to his EEO claim may have been aggravating or demeaning, such accusations simply to do not demonstrate the type of extreme behavior that the Supreme Court requires to make out a prima facie case of hostile work environment discrimination.

Furthermore, despite Mr. Chaple's argument that "all of these numerous actions separately and cumulatively . . . interfered with [Mr. Chaple]'s work performance," Pl.'s Opp'n at 40, this is not the standard for establishing a hostile work environment. Rather, Mr. Chaple needed to establish a connected stream of behavior that was severe enough to alter the conditions of his employment. He merely has reasserted scattered portions of his previous claims. The Court cannot infer a pattern of discrimination based on the timing or frequency of the alleged actions, especially since the actions took place during several different time periods. Even though the acts that Mr. Chaple alleges may support his other claims, they are not sufficient to establish a claim of hostile work environment.

Were Mr. Chaple's allegations sufficiently connected to constitute a course of behavior that altered the terms and conditions of his employment, Mr. Chaple nevertheless fails to allege facts sufficient to demonstrate that the workplace behavior that he claims made his life "a living hell," Pl.'s Opp'n at 41, was motivated by national origin discrimination. *See Lester*, 290 F. Supp. 2d at 31 (finding that without "evidence of any racial element to either [allegedly harassing] event," defendants were entitled to summary judgment on the hostile work environment claim). Absent such a showing, the Court cannot find that Mr. Chaple has met his prima facie burden. Therefore, the Court will grant summary judgment in favor of the EPA on the hostile work environment claim.

## IV. CONCLUSION

For the reasons described above, the EPA's motion for summary judgment [Dkt. #18] will be granted in part and denied in part.  More specifically, summary judgment will be granted in favor of the EPA on the following claims: 1) the claim for constructive discharge; 2) the claim that removing Mr. Chaple from the Co-Chair position was a discriminatory action; 3) the claim concerning the request for medical information; and 4) the claim of discrimination based on a hostile work environment.  Summary judgment will be denied with regard to the remainder of Mr. Chaple's claims, as triable issues of fact remain.  A memorializing order accompanies this Memorandum Opinion.


Date:   September 22,  2006                 _____/s/_____
                                                          ROSEMARY M. COLLYER
                                                          United States District Judge